IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH BOLAND, | ) | |
| | ) | |
|     on behalf of herself and | ) | |
|     others similarly situated, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: |
| | ) | |
| THE BAUE FUNERAL HOME CO., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Serve Registered Agent: | ) | |
| Daniel K. Barklage | ) | |
| 211 North Third Street | ) | |
| St. Charles, Missouri 63301 | ) | |
| | ) | |
| & | ) | |
| | ) | |
| ST. CHARLES MEMORIAL GARDENS, | ) | |
| INC., | ) | |
| | ) | |
| Serve Registered Agent: | ) | |
| Daniel K. Barklage | ) | |
| 211 North Third Street | ) | |
| St. Charles, Missouri 63301 | ) | |
| | ) | |
|     Defendants. | ) | |

## <u>VERIFIED COMPLAINT</u>

COMES NOW Plaintiff Sarah Boland (referred to as "Plaintiff") on behalf of herself and

others similarly-situated, by and through undersigned counsel, and for her Verified Complaint

against Defendants The Baue Funeral Home Co. and St. Charles Memorial Gardens, Inc.

(collectively referred to as "Defendants"), states as follows:

1

1.     Plaintiff Sarah Boland ("Plaintiff") is an adult citizen who currently resides in St. Charles, Missouri.  During all times relevant herein, Plaintiff was a resident of St. Charles, Missouri.

2.     Defendant The Baue Funeral Home Co. ("Baue") is a Missouri corporation located in St. Charles, Missouri.  Baue is in the business of providing funeral home services to customers.

3.     Defendant St. Charles Memorial Gardens, Inc. ("Memorial Gardens;" with Baue, "Defendants") is a company located in St. Charles, Missouri, with its laws incorporated in the State of Missouri.  Memorial Gardens is in the business of providing cemetery services to customers.

## JURISDICTON AND VENUE

4.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331 and § 1367, in that Plaintiff has alleged claims pursuant to the Family Medical Leave Act ("FMLA") under 29 U.S.C. § 2617 and the Fair Labor Standards Act under 29 U.S.C. § 201 *et seq*., and Plaintiff's Missouri state law claims are part of the same case or controversy pertaining to her former employment with Defendants.

5.     Venue in this district is proper under 28 U.S.C. § 1391(b) and (c), because all Defendants reside in St. Charles, which is located in the Eastern District of Missouri, and a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.     Background of Parties**

6.     Baue is in the business of providing embalming, cremation, and cemetery services. Baue is the largest funeral home in St. Charles County, having three locations in an area with a relatively small population.  Families from all over the St. Louis community and surrounding area use Baue's funeral services.

7.     Memorial Gardens is a cemetery located in St. Charles County, Missouri, where families from all over the St. Louis area choose to bury their loved ones.

8.     On information and belief, Baue and Memorial Gardens each employ over fifty employees.

9.     Plaintiff has been licensed to work as a funeral director in Missouri since August 20, 2012.

10.    Due to the nature of the business, the practices and requirements of funeral homes and funeral directors are strictly governed by state and federal law.  *See* R.S. Mo. Ch. 333; 16 C.F.R. §§ 453.1-453.9.

11.    The Federal Trade Commission ("FTC") has enacted several regulations generally known as the "Funeral Rule," which require funeral homes to provide funeral homes to be open and upfront about their pricing.  The FTC has summarized the Funeral Rule as follows:

> "The Funeral Rule, enforced by the Federal Trade Commission ("FTC"), makes it possible for you to choose only those goods and services you want or need and to pay only for those you select, whether you are making arrangements when a death occurs or in advance.  The Rule allows you compare prices among funeral homes, and makes it possible for you to select the funeral arrangements you want at the home you use."

12.    The Funeral Rule requires funeral providers like Defendants to furnish "accurate price information disclosing the cost to the purchaser for each of the specific funeral goods and funeral services used in connection with the disposition of deceased human bodies, including at least the price of embalming, transportation of remains, use of facilities, caskets, outer burial containers, immediate burials, or direct cremations, to persons inquiring about the purchase of funerals."  16 C.F.R. § 453.2(a).

13.     To ensure funeral homes comply with their disclosure requirements and do not engage in deceptive practices, the FTC has enacted several preventative measures, including requirements that funeral providers:

(a)     allow customers to purchase separate goods and services as opposed to requiring the purchase of a package that includes unwanted items;

(b)     provide accurate pricing information over the telephone upon request by a customer;

(c)     provide a written General Price List ("GPL") to the customers when they visit a funeral home, which must be given "upon beginning discussion of any of the following: (1) The prices of funeral goods or funeral services; (2) The overall type of funeral service or disposition; or (3) Specific funeral goods or funeral services offered by the funeral provider" and provide a detailed list of all services and products offered;

(d)     provide a detailed written list of the casket and alternative container prices to people who inquire in person, which must be given "upon beginning discussion of, but in any event before showing caskets;"

(e)     provide a detailed written list of the outer burial container prices to people who inquire in person, which must be given "upon beginning discussion of, but in any event before showing caskets;"

(f)     provide an itemized written statement to customers when the discussion of funeral arrangements concludes but before the customer pays for the goods and/or services;

(g)     provide a statement in writing that that describes any legal or cemetery requirements for specific funeral goods and/or services;

(h)     inform customers that they may use an "alternative container" instead of a casket for cremation;

(i)     to handle a casket or urn that was purchased by an alternate provider; and

(j)     inform the customer about any state requirements pertaining to embalming. *See* 16 C.F.R. §§ 453.2-453.5.

14.     The FTC also requires funeral homes like Defendants to make all required disclosures "in a clear and conspicuous manner."  *See* 16 C.F.R. §§ 453.7.

**B.     Plaintiff's Employment with Defendants**

15.     In  May 2013, Defendants hired Plaintiff to work as a Funeral Director at an hourly rate of $17.50 per hour.

16.     On or about May 24, 2013, Plaintiff signed a document entitled "Covenant Not To Compete" with Defendants.  *See* **Exhibit 1**.  The agreement contains a non-compete clause purportedly restricting Plaintiff from competing with Baue and/or Memorial Gardens for two (2) years following the termination of her employment:

> Employee shall not, directly or indirectly as an employee, owner, consultant, or otherwise, or through any corporation, partnership, proprietorship or association in which Employee has any interest whatsoever, engage in the embalming, funeral home, cremation service, or cemetery service business in St. Charles County, Missouri.  In addition, Employee agrees that he [sic] may not work for a competitive person or firm that has a presence in St. Charles County, Missouri, but has its business location outside of St. Charles County, Missouri.

(Exhibit 1, p. 1).

17.     A substantial number of funeral homes outside of St. Charles County (including those in St. Louis City, St. Louis County, eastern Missouri, and western Illinois) also provide services in St. Charles County.

18.     Many funeral homes outside of St. Charles County conduct funerals at burial sites located in St. Charles County, which are abundant.  Upon information and belief, at least thirty-one (31) cemeteries are located in St. Charles County.

19.     Plaintiff is unaware of any other funeral provider in St. Charles County or the greater St. Louis area that requires its funeral directors to sign a non-compete agreement.

20.     During Plaintiff's employment with Defendants, Defendants employed approximately eleven (11) other Funeral Directors across its three locations.

21.     As one of Defendants' Funeral Directors, Plaintiff was responsible for guiding customers through the funeral process.  Plaintiffs' jobs tasks included: assisting customers in making funeral arrangements; selling and/or upselling Defendants' funeral services; being available to address customers' concerns as needed; and executing visitation and funeral services.  In addition, Defendants required Plaintiff to read and participate then in a weekly book club at work, and volunteer with non-profit organizations as part of Plaintiff's employment.

22.     Defendants' Funeral Directors were not responsible for propositioning or obtaining customers on behalf of Defendants.  The Funeral Directors did not participate in the recruitment or solicitation of customers to use Defendants' services.  Rather, Defendants used different employees for the initial intake of customer calls and pre-arrangement sales activities.

23.     Defendants would use the same system for scheduling all of their Funeral Directors. The schedule would require Funeral Directors to work for seven days in a row, then be off work for two days, then be scheduled to work three days in a row, then be off for two days.  In effect, it would mean Plaintiff would be scheduled off work every other weekend (see below):

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|--------|---------|-----------|----------|--------|----------|--------|
| **WORK** | **WORK** | **WORK** | OFF | OFF | OFF | **WORK** |
| **WORK** | **WORK** | **WORK** | **WORK** | **WORK** | OFF | OFF |

24.     As a Funeral Director, Plaintiff's job predominantly required the performance of three types of activities with customers: (a) Arrangements; (b) Visitations; and (c) Funerals.

25.     An Arrangement is an in-person meeting whereby the Funeral Director meets with a customer to discuss all pre-funeral preparations and payment.

26.     A Visitation is service often held at Defendants' funeral home whereby the family and friends of the deceased may view and/or be in the presence of the deceased.

27.     A Funeral is a service whereby the family and friends of the deceased hold a ceremony in the deceased's honor, which is often followed by a burial or internment of the deceased.

28.     When Plaintiff was scheduled to work, she would receive an e-mail from the Defendants the night before her shift containing a schedule.  The schedule would notify Plaintiff whether she was required to work Arrangements, Visitations and/or Funerals, including the start time for each event.  If Plaintiff was working a Visitation and/or Funeral, the schedule would also include the last name of the deceased, the location of the event, and if the event required a "lead car" for the procession, what lead car to pick up.

29.     In the morning at 8:00 a.m. on the day Plaintiff was scheduled to work, Defendants would transmit an e-mail to all Defendants' employees called the "Huddle."  If Plaintiff was working Arrangements for the day, the Huddle would include information regarding the deceased's name, the next of kin's name for the deceased, the location of the Arrangement, the

time of the appointment, and limited information pertaining to the funeral and/or burial. If Plaintiff was working a Visitation and/or Funeral for the day, no information would be included on the Huddle.

30.     In general, customers were randomly assigned to Funeral Directors based on their work schedules and the location where the Funeral Directors were assigned.

31.     As a caveat, there were unique scheduling concerns for customers with "special deaths" ("SPDs"). SPDs involved rare situations when the circumstances surrounding the deceased's death were likely to require additional customer attention from the Funeral Director. SPDs included, for example, infant deaths, teenage deaths, suicides, deaths of multiple family members in close proximity of one another, homicides, etc.

32.     Due to the additional time required and emotionally-draining nature of SPDs, Defendants would try to schedule Funeral Directors so that no one would be assigned more than two (2) SPDs per month.

33.     It was extremely rare for a customer to request a specific Funeral Director. There were generally only two situations when a customer would request to meet with or receive services from a specific Funeral Director: (1) if the customer knew the Funeral Director personally in a context outside of work; or (2) if a customer required services for multiple family members with a short period of time (i.e. when there were only a few days or weeks between the deaths of two different individuals for the same customer).

### *Arrangements*

34.     If Plaintiff was assigned to perform Arrangements, she would be given two customers to meet with in-person per day. The first customer would be scheduled at 9:30 a.m.,

and the second customer would be scheduled at 2:00 p.m. Arrangements would take place at Defendants' funeral home.

35. Since the conversations and disclosures made during arrangements are strictly regulated by the FTC, Plaintiff's interactions with customers were highly scripted and controlled by Defendants. Defendants required its Funeral Directors to receive training on how to perform Arrangements at Graystone Associates, Inc. ("Graystone"), a third-party company that provides training to funeral home employees based in Houston, Texas.

36. When Plaintiff would perform an Arrangement, she would first meet the customer in-person for the first time. First, Plaintiff would give the customer a tour of the funeral home before taking him or her to the Arrangement room.

37. Once the customer was in the Arrangement room, the first thing Plaintiff would do is give the customer a copy of the GPL as required by the FTC regulations.

38. Next, Plaintiff would gently ask the customer biographical questions about the deceased for purposes of completing the death certificate.

39. Plaintiff would also obtain biographical information about the deceased and ask questions about his or her loved ones for purposes of completing an obituary.

40. Next, Plaintiff would give the customer a floral book, which made available from a third-party florist and contained a set pricing list.

41. Plaintiff would also give the customer information about register books and prayer cards, which also contained set prices that were conspicuously disclosed to the customer.

42. While the customer was reviewing the products and pricing information about floral arrangements, register books and/or prayer cards, Plaintiff would briefly leave the Arrangement room to generate the paperwork for documenting the death of the deceased. Either Plaintiff or an

associate for Defendants would (a) complete the deceased's death certificate on the form provided by the State of Missouri; (b) type up a short obituary for the deceased; and (c) complete the notification of death required by the Social Security Administration.

43.     Once the paperwork was completed, Plaintiff would return to the Arrangement room, and the customer would review the paperwork for content and accuracy.

44.     Next, Plaintiff would guide the customer into the Selection room to choose a casket, urn and/or vault for the deceased.  Pursuant to the FTC regulations, all prices for the caskets, urns and vaults were clearly marked and listed on both the wall and within a pricing book that was available to customers.

45.     While Plaintiff was available to answer the customer's questions about the products in the Selection room, she would not "hard sell" any product out of sensitivity to the customer.

46.     Once the customer was finished viewing the products in the Selection room, Plaintiff would escort the customer back to the Arrangement room to complete the meeting.

47.     Once the customer was in the Arrangement room, Plaintiff would ask the customer about the details for the deceased's visitation, funeral and/or burial.  Generally, Plaintiff was required to merely record the information that was pre-determined by the customer regarding the location of any service, the names of relevant clergymen, location of the burial, etc.  Customers would not ask Plaintiff to make suggestions regarding any service- or burial-related decisions; rather, Plaintiff would merely ask the customer about his or her preferences and ensure the information was recorded to reflect those wishes.

48.     Plaintiff would also gently ask the customer about his or her selection of a casket, urn, vault, and other funeral-related products.  To the extent the customer asked, Plaintiff informed him or her about any embalming requirements, cemetery requirements for vaults, etc.  Plaintiff

was required by FTC regulations to answer any questions truthfully regarding any burial requirements and by forthcoming about the prices for such items or services.

49.     After Plaintiff was finished speaking with the client about visitation, funeral and burial arrangements, the Plaintiff would generate a final bill.  As required by the FTC regulations, the Plaintiff would give the final bill to the customer to review prior to making payment.

50.     Plaintiff would also review the payment options with the customer.  Defendants only offered two options for payment: (1) if the deceased had a life insurance policy, the customer could opt to have Defendants send an assignment to the life insurance company, which would pay Defendants the full amount directly; or (2) the customer could pay the full amount up front. Plaintiff did not have the discretion to negotiate any other payment option with the customer.

51.     Once the customer was comfortable with the bill and provided payment, Plaintiff would walk the customer outside and bid him or her farewell.

52.     In total, Plaintiff's Arrangement with a customer would take between 2 to 4 hours.

53.     When Plaintiff would meet customers for Arrangements, in general, the customer was already certain that he or she was going to use Defendants' services.  On rare occasions, if the customer was not yet sure whether he or she would use Defendants' services, the customer was merely price-shopping.  To the extent the customer ultimately decided to use Defendants, it was motivated by cost as opposed to any "relationship" formed with Plaintiff during the Arrangement.

54.     Generally, the Arrangement would occur between 1 – 4 days before the Visitation and/or the Funeral.

55.     It was rare for a customer to follow up with Plaintiff about anything following an Arrangement.  In extreme situations, Plaintiff was required to speak with a customer every day for

up to twenty minutes between the Arrangement and the Funeral. Stated differently, Plaintiff would speak with a customer, at most, for up to 80 minutes over the telephone following an Arrangement.

56.     Often times, Plaintiff would only speak with a customer once again following the Arrangement to notify him or her that the deceased's death certificate had arrived (unless Plaintiff was scheduled to oversee the Visitation and/or Funeral for the customer as well). Plaintiff's assignment to a particular customer's Visitation and/or Funeral often depended on her schedule as opposed to any special request from the customer.

57.     The only times when Defendants required Plaintiff to oversee the Arrangement, Visitation and Funeral for the same customer was for situations involving SPDs.

*Visitations*

58.     A Visitation would generally occur the day before the Funeral or the same day as a Funeral.

59.     If Plaintiff was scheduled to oversee a Visitation, she would generally arrive early to ensure the casket, flowers, reception book, and any other items were properly arranged.

60.     If the visitation was open-casket, Plaintiff would meet with the family an hour in advance of the Visitation so family members could view their loved one.

61.     Generally, Plaintiff would not need to directly interact with the customer unless there was a problem with the way the deceased looked. If there was an issue, the Plaintiff would contact Defendants' embalmer to come and address the situation.

62.     Once the family was settled in the Visitation room, Plaintiff would stand at the back of the room and make herself available if anyone approached her with a question or issue.

63.     In general, if the Visitation went smoothly, Plaintiff would interact very little with the customer or any other attendees.

64.     Plaintiff would not affirmatively approach the family or any other guests to interact with them due to the sensitive nature of the Visitation.  Defendants also instructed Plaintiff not to wear her name badge during Visitations to avoid detracting attention away from the deceased, the customers, or their loved ones.

65.     Once the Visitation concluded, if it was not immediately followed by a Funeral Service, the Plaintiff would approach the customer to ensure everything was satisfactory and bid the customer farewell.

66.     On average, a Visitation may last 2 to 5 hours, depending on the expected number of attendees.

### *Funerals*

67.     Funerals would generally occur at a place of worship or at Defendants' funeral home.

68.     If the Funeral occurred at Defendants' funeral home, Plaintiff would generally start her job tasks the same way she would with a Visitation.  She would arrive early to ensure the casket, flowers, reception book, and any other items were properly arranged.

69.     If the Funeral occurred at a place of worship, Plaintiff would also greet the clergy member performing the service in addition to setting up the casket, flowers, reception book, and other items; however, the clergy member and/or church staff would be responsible for facilitating all other aspects of the service.

70.     Following her initial tasks, Plaintiff would greet the family of the deceased when they arrived.  The conversation was generally brief and involved confirming with the family that all requested tasks had been completed.

71.     Once the family was situated, Plaintiff would stand at the back of the room and make herself available if anyone approached her with a question or issue.

72.     Once the Funeral service started, Plaintiff would interact very little (if at all) with the customer or any other attendees.

73.     Plaintiff would not affirmatively approach the family or any other guests to interact with them due to the sensitive nature of the Funeral.  Defendants also instructed Plaintiff not to wear her name badge during Funeral to avoid detracting attention away from the deceased, the customers, or their loved ones.

74.     Once the Funeral service concluded, Plaintiff would briefly interact with the customer and family of the deceased to confirm any details pertaining to travel to the burial site. After this brief interaction, Plaintiff would travel to the burial site and make herself available to ensure the casket (and vault, if applicable) were properly in place.

75.     During the burial service, Plaintiff would stand to the side and make herself available if anyone had questions or concerns.  Once again, due to the sensitive nature of the burial, Plaintiff would interact very little (if at all) with the customer, family or guests.

76.     Once the burial service was concluded, Plaintiff would ensure the burial went smoothly and interact briefly with the customer a final time to bid farewell and ensure Defendants' services were satisfactory.

77.     On average, a Funeral may last 1 to 6 hours, depending on (a) whether a Visitation preceded the Funeral on the same day; (b) whether a Funeral service occurred; and (c) whether a burial occurred; and (d) if so, how long the burial service lasted.

78.     On average, Plaintiff would spend between 2 – 8 hours interacting with the same customer on behalf of Defendant.  Plaintiff's interaction would also occur over a 1 – 4 day period with each customer.

79.     Due to the nature of Defendants' business, Plaintiff also did not experience repeated business from the same customers during her employment.

80.     To the extent customers were referred to Defendants, it was not common for a customer to request the services of a specific Funeral Director.  Rather, customers would be referred to Defendants' business, and Defendants would randomly assign the customer to one of its many Funeral Directors.

81.     Plaintiff only recalls one time when a customer requested her specific services as a Funeral Director.  The customer was an acquaintance of Plaintiff who knew her prior to her employment with Defendants.

82.     As a Funeral Director for Defendants, Plaintiff did not utilize or develop any special skills to increase Defendants' business.  Rather, Plaintiff was predominantly responsible for answering inquiries from customers regarding Defendants' pricing and services, which were predetermined and contained on a list provided to customers.

83.     In addition, Defendants maintain an extensive website outlining their available services.

84.     While Plaintiff may provide some guidance to customers regarding their selections, she was largely responsible for implementing the selections and requests of the customers in an accurate, efficient and professional manner.

85.     Due to the nature of the funeral and burial business, Funeral Directors are not in a position to divert customer goodwill from Defendants on behalf of another company.  Customers

generally require funeral services for their deceased family members or friends only a few times in their lives, if at all. If a customer uses funeral services more than once in his or her lifetime, there are often significant time lapses between those instances when services are required. To the extent customers give repeated business to Defendants by using their services, the business is sporadic, unpredictable, and often occurs years after the initial services were rendered.

86. A customer's selection of a specific funeral home or cemetery is often governed by other outside factors beyond the control Defendants or their employees. For instance, selection of a specific funeral home or burial site is often predetermined or influenced by designations in the deceased's will or other legal documents, the location where the deceased lived during his or her life, the location where the deceased's immediate family is living at the time of death, the location of family plots or cemeteries, the ability of family or friends to afford funeral services, etc.

87. Due to the nature of Defendants' business, Funeral Directors are also not in a position to solicit Defendants' customers on behalf of another company. Defendants' customer base consists of bereaving individuals; as a result, it is not the sort of business for which solicitation by a similar company for future business is appropriate or likely to be successful.

88. Plaintiff was also not given access to Defendants' confidential, proprietary information and/or trade secrets during her employment (to the extent any existed).

89. As a funeral home and cemetery, the FTC prohibits Defendants from keeping the pricing of their services or products confidential or "secret."

90. Since funeral homes are required to make their pricing lists publicly available, Defendants would often travel to other funeral homes in the surrounding area to "shop" their pricing lists.

91.     In addition, Defendants did not keep their customers confidential or "secret." Defendants maintain an "Obituaries" section on their public website, which contains: (a) the name of the deceased individual; (b) the date of birth and death for the deceased; and (c) the date and time of the service.   In addition, the webpage contains a "view" button for each deceased individual, which provides additional information about the deceased's life and his or her immediately family members.

92.     Each "Obituaries" page contains 10 separate entries and is 1,274 pages long.  Stated differently, the Obituaries section contains personal information for approximately 12,740 individuals, which dates back at least fifteen years.

93.     The "Obituaries" section is also searchable by last and first name and contains a "Subscription" option whereby website users can sign up to receive automatic notifications of newly-entered obituaries.

**C.      Defendants' Failure to Pay Plaintiff Overtime**

94.     As a Funeral Director, Plaintiff was an hourly, non-exempt employee under the Fair Labor Standards Act ("FLSA").

95.     Plaintiff routinely worked in excess of forty hours per workweek during her employment with Defendants.

96.     Defendants provided Funeral Directors with company cell phones to keep in touch with customers.   Plaintiff and other Funeral Directors were required to give customers their company cell phone number, which customers called several times after "work hours." Defendants' customers would call Plaintiff's company cell phone to inquire about funeral home services.

97.     Customers would call Plaintiff during non-scheduled work hours, including in the middle of the night.  Plaintiff was not paid for answering customer calls outside of scheduled work hours.

98.     If Funeral Directors did not answer the customer calls, they risked losing their perfect 100% customer satisfaction rating.

99.     Defendants required Funeral Directors to participate in a weekly book club meeting every Wednesday at 7:00 a.m. during paid work time.  Defendants required Funeral Directors to read books that were related to business management topics.  Funeral directors were required to read approximately four book chapters per week during their "free time," and actively participate in the book club discussion.

100.    Each week, Funeral Directors were not compensated for reading in preparation of the mandatory work book club meetings.

101.    Defendants also required Funeral Directors to volunteer during non-work hours. Plaintiff performed mandatory voluntary work for the Share Companion program, where she went to hospitals and helped people who had lost children under the age of thirty (30) days old.  Funeral directors were not compensated for the mandatory volunteer work.

**D.     Defendants' Unlawful Termination of Plaintiff's Employment**

102.    During Plaintiff's employment, Defendants evaluated their Funeral Directors by sending out surveys to their previous customers.  Defendants demanded a customer satisfaction rate of 100% for their Funeral Directors; anything less was deemed unacceptable.

103.    In or around May 2015, after working for Defendants for one year, Plaintiff was given a performance review.  Plaintiff's supervisors criticized her for several reasons, including

(a) alleged failure to obtain and hold a 100% customer satisfaction rate; (b) low sales; and (c) insufficient efforts toward volunteering for a nonprofit organization.

104.    During the performance review, Plaintiff was placed on a ninety (90) day probationary period.  Plaintiff was told that if she did not obtain and hold a 100% customer satisfaction rate during the ninety (90) day period, Defendants would terminate her employment.

105.    In or around mid-September 2014, Plaintiff had obtained and held a 100% customer satisfaction rate for ninety (90) days.  Despite Plaintiff's increased satisfaction rate, Plaintiffs' supervisor, John Devany, informed her that anyone could obtain a 100% satisfaction rate for three (3) months, and placed Plaintiff on indefinite probation.

106.    In September 2014, Plaintiff received information that her great aunt was suffering from breast cancer.

107.    Plaintiff's great aunt stood in loco parentis to Plaintiff as a child.  Throughout Plaintiff's childhood, she would stay the entire summer with her great aunt due to a difficult relationship Plaintiff had with her biological mother.  In addition, Plaintiff moved in with her great aunt and lived with her fulltime at the age of 17.  Plaintiff's great aunt provided emotional and financial support to Plaintiff as a parent throughout her childhood.

108.    Defendants were aware the Plaintiff was very close to her great aunt and considered her to be like a parent.

109.    When Plaintiff received this information, she informed Todd Dilbert, another supervisor for Defendants, via telephone that she would be traveling to Washington State to tend to her great aunt's illness.

110.    Mr. Dilbert indicated that Plaintiff could leave to tend to her great aunt and asked Plaintiff to "just keep him posted."   Mr. Dilbert never stated to Plaintiff that she needed to

complete any paperwork in connection with her anticipated leave, or that he required additional information. As a result, Plaintiff turned off her work cell phone and drove to Washington State the next day.

111.     Approximately five days after speaking with Mr. Dilbert, Plaintiff received a call from Defendants indicating that her employment was terminated. Plaintiff was still on leave in Washington at the time. Plaintiff was informed that her supervisors had attempted to contact Plaintiff several times while she was tending to her great aunt.

**E.     Plaintiff's Employment with Alternative as a Part-Time Receptionist**

112.     Later in 2014 following her termination from Defendants, Plaintiff returned to St. Charles, Missouri to care for her grandmother with dementia. At that time, Plaintiff applied for several different kinds of jobs, but she was unable to acquire new employment.

113.     Eventually, in January 2015, Plaintiff secured a position as a part-time receptionist for Alternative Funeral & Cremation Services ("Alternative").

114.     Alternative is a small funeral home located in Saint Peters, Missouri. Alternative only has two funeral directors.

115.     When Plaintiff applied to work for Alternative, she informed the company about the non-compete document she signed with Defendants. Plaintiff also informed Alternative that she had a funeral director's license in Missouri. As a result, Alternative hired Plaintiff to work part-time as a receptionist at $10 per hour.

116.     Plaintiff's job as a receptionist did not entail any of the same skills or knowledge she utilized as a Funeral Director for Defendants. Plaintiff's primary duties included answering phones, typing up death certificates, calling physicians, and filing documents. Plaintiff was not in a management position and had no role in soliciting or finding new clients.

117. As a receptionist, Plaintiff had very little in-person interaction with Alternative's customers. Generally, Plaintiff was responsible for greeting the customers when they arrived and coordinating their appointments with Alternative's funeral directors.

118. To avoid any health or safety code issues, Alternative instructed Plaintiff to post her funeral director's license at the desk where she sat as a receptionist. In addition, Alternative added the title "funeral director" on Plaintiff's business card merely to reflect that she was licensed; however, Alternative did not have Plaintiff perform job tasks as a Funeral Director.

**F.    Defendants' Unlawful Interference with Plaintiff's Employment at Alternative**

119. Following Plaintiff's employment with Alternative, employees for Defendants visited Alternative to shop their price list. When Defendants' employees arrived at Alternative, they observed Plaintiff sitting behind the receptionist's desk.

120. Shortly thereafter, Defendants sent letters to Plaintiff and Alternative regarding Plaintiff's non-compete agreement, which are attached as **Exhibits 2 and 3**, respectively. Both letters are dated February 18, 2015.

121. In Defendants' letter to Alternative, they claimed Plaintiff violated her non-compete agreement because "she is working as a funeral director for [Alternative] and is in the process of improperly competing against [Defendants'] clients." *See* **Exhibit 2.** Defendants also "consider [Alternative] a co-conspirator, along with Sarah Boland, concerning the breach of the Covenant Not to Compete." (*Id.*).

122. In Defendants' letter to Plaintiff, they claimed Plaintiff violated her non-compete agreement because she was "now directly competing with [Defendants'] clients and [was] soliciting and dealing with [Defendants'] customers and contact." Defendants also "demand[ed] that [Plaintiff] cease and desist [her] employment immediately with Alternative Funeral &

Cremation Services." *See* **Exhibit 3.** Defendants also demanded "a statement and proof that [Plaintiff did] not taken with [her] any confidential information, customer lists or other property of [Defendants'] clients." *Id.* Notably, Defendants did not specify what, if any, confidential information is alleged to have been taken.

123. Defendants, without legal justification, intentionally interfered with Plaintiff's employment and business expectancy with Alternative by accusing it of acting as a "co-conspirator, along with Sarah Boland, concerning the breach of the Covenant Not To Compete**."** *See* **Exhibit 3.**

124. On February 23, 2015, Alternative informed Plaintiff it would be willing to allow Plaintiff to continue working as a part-time receptionist if she could resolve the noncompete dispute with Defendants. However, if the dispute is not resolved, Alternative stated it would seek to hire a new part-time receptionist.

125. On March 2, 2015, Plaintiff's counsel sent a letter to Defendants' counsel regarding the contentions raised in their cease and desist letters. Plaintiff informed Defendants that their actions were improper, and the non-compete was unenforceable. Moreover, Plaintiff assured Defendants that she is not working as a funeral director for Alternative (despite any legitimate basis Defendants may have for preventing her from doing so). A copy of the letter is attached as **Exhibit 4.**

126. Defendants have made no efforts to resolve the current dispute. Upon information and belief, Plaintiff's employment with Alternative has been terminated, but may be reinstated pending the outcome of this litigation. Plaintiff's termination was the direct result of Defendant's unlawful interference with her employment.

### G.      The Unenforceability of Plaintiff's Non-Compete

127.      Defendants lack any protectable interests under their non-compete agreement with Plaintiff.

128.      Plaintiff did not have any protected customer goodwill, lists, or contacts during her employment with Defendants.

129.      Plaintiff had no continuing relationships with Defendants' customers. Families and individuals would seek Defendants' services, and Plaintiff would be one of the many Funeral Directors who would assist them.

130.      Funeral Directors would only learn who their clients were through the "Huddle" email, which came the night prior to meeting the client. Thus, Plaintiff's only "clients" were those that came to the funeral home after predetermining they would use Defendants' services.

131.      The general nature of funeral homes and Plaintiff's job duties precludes Defendants from asserting Plaintiff protectable customer goodwill. Plaintiff would have limited interactions with Defendants' customer and largely acted as a mere conduit to ensuring their pre-determined wishes were carried out. Moreover, Plaintiff's interactions with Defendants' customers were short and over a brief period of time lasting less than a week.

132.      Even if Defendants' customers were a protectable interest, Defendants have not taken efforts to keep this information confidential from competitors or the general public; to the contrary, Defendant publishes a list of its "customers" online and makes affirmative efforts to disseminate this information.

133.      Defendants' lack of protectable interests is evidenced by the fact that it is the only known funeral home and cemetery in the St. Louis area to use non-compete agreements for its funeral directors.

134. Even if Defendant had protectable customer contacts, Plaintiff has not used any information gained through her employment with Defendants for her personal benefit at Alternative. She has not solicited or contacted any current or former customers.

135. Plaintiff also did not possess or have knowledge of any trade secrets during her employment with Defendants. Defendants' operation as a funeral home makes it nearly impossible for Defendant to possess any "trade secrets." The FTC's regulation of funeral homes through its Section 5 power requires Defendants' to disclose its price lists and business practices to the public. *See* 16 C.F.R. § 453.2-435.5.

136. Pursuant to the FTC regulations, Plaintiff possessed no information that would qualify as a trade secret.

137. Defendants' non-compete agreement with Plaintiff is impermissibly vague and lacks any reasonable geographic scope or temporal limitations.

138. Defendants previously allowed Plaintiff to work at the Cremation Society of Missouri, another funeral provider in St. Charles County, while she worked for Defendants. As a result, Defendants should be estopped from enforcing the noncompete agreement.

139. Plaintiff does not compete with Defendants in a way that would violate any protectable interest. Plaintiff worked for Alternative as a receptionist, and her job duties of answering phones, filing paperwork, filling out death certificates, and calling physicians.

**H.   Plaintiff's Irreparable Harm Caused by Defendants' Conduct**

140. Plaintiff is a financially independent adult who requires employment-related income to sustain her quality of life.

141. Plaintiff has four children to care for and must also take care of her grandmother, who is suffering from dementia.

142.     Plaintiff has encountered significant difficulty in finding a job to support her four surviving children.  Plaintiff recently applied to a substantial number of employers in and near St. Charles County; however, she was unable to secure employment anywhere other than her part-time receptionist job at Alternative.

143.     Plaintiff also expended significant time and expense in obtaining a license as a funeral director.  She will lose significant earning potential and sustain loss of income if she cannot work as a funeral director.

144.     Plaintiff's employer, Alternative, had indicated it is unwilling to allow Plaintiff to return to work unless she obtains a court order enjoining Defendants' interference with her employment.

145.     Defendants' unlawful efforts to restrain its employees' post-employment activities have placed undue burden on the public, in that several current and former Funeral Directors of Defendant believe they cannot obtain employment at a funeral home in the greater St. Louis area within two years of employment for Defendants.

146.     Defendants will suffer no harm if Plaintiff works for Alternative.  Defendants have no protectable interests under the non-compete agreement.  Rather, it appears Defendants' only interest is in quashing lawful competition in any form.  Moreover, Plaintiff poses no threat of harm to Defendants as a part-time receptionist.

## COUNT I
## (CLAIM FOR DECLARATORY JUDGMENT
## AND IMMEDIATE INJUNCTIVE RELIEF)

147.     Plaintiff hereby adopts and incorporates by reference, as if more fully set forth herein, the above-stated paragraphs as incorporated into and part of Count I of this Complaint.

148.    Jurisdiction is proper for this Missouri state law claim pursuant to 28 U.S.C. § 1367. This court has supplemental jurisdiction over the state law claim because the FLSA overtime violations and FMLA violations are so related to the state law claim that they are part of the same common nucleus of operative fact.

149.    A controversy exists between the parties as to whether the purported non-compete agreement, which is preventing Plaintiff from obtaining employment at Alternative, is an unenforceable and illegal contract under Missouri law.

150.    The non-compete is unenforceable because it does not guard against any of Defendants' legitimate protectable business interests.

151.    The non-compete agreement does not protect against the improper use or disclosure of any customer goodwill, contacts, or lists possessed by Plaintiff.

152.    The non-compete agreement does not protect against the improper use or disclosure of any "trade secrets" possessed by Plaintiff.

153.    The non-compete agreement is unenforceable because it is overbroad in geographic scope and duration.  The non-compete restricts Plaintiff from working in the funeral home industry not only in St. Charles County, but also from working for "a competitive person or firm that *has a presence* in St. Charles County, Missouri."  The non-compete agreement's vague use of the term "presence" is vague, ambiguous, and potentially renders the agreement unlimited in geographic scope.  The non-compete clause is also overbroad with respect to duration, in that two years is almost twice the amount of time Plaintiff worked for Defendants and not reasonable with respect to any purported interests of Defendants.

154.    The non-compete agreement unenforceable because Plaintiff does not compete with Defendants.  Plaintiff's work as a receptionist for Alternative does not overlap significantly

with any of the job duties she performed for Defendants as a Funeral Director, nor is she in a position to improperly use, solicit or misappropriate customer goodwill, contacts or trade secrets. Her duties of answering phones, filing paperwork, filling out death certificates, and calling physicians are not remotely competitive with Defendants, let alone materially competitive.

155. Equity factors also prevent Defendants from enforcing the non-compete. Plaintiff has encountered significant troubles in finding alternative employment to support her four children and grandmother with dementia. Plaintiff's impending permanent loss of employment poses a significant economic hardship on her.

156. The public interest is also impacted, in that many other current and former Funeral Directors of Defendants believe they are bound by the same unenforceable non-compete restrictions.

157. Defendants, on the other hand, cannot point to any equity factors that weigh in their favor. Defendants have no legitimate interests to be protected by the non-compete agreement. Defendants also have unclean hands, in that they: (a) terminated Plaintiff's employment in violation of the FMLA and without cause; and (b) tortiously interfered with Plaintiff's employment without justification.

158. As a result of Defendants' actions, Alternative refuses to allow Plaintiff to return to work pending sufficient resolution of the dispute with Defendants.

159. Plaintiff seeks a declaration of legal rights so that she, Alternative, and other potential employers of Plaintiff understand the conditions, if any, upon which she is able to obtain and maintain employment within the funeral home industry.

160. Plaintiff has suffered, and will continue to suffer, immediate irreparable harm and will have no adequate remedy at law if the Court does not grant injunctive relief.

161.     By reason of the foregoing, a Declaratory Judgment under Section 527.010 RSMo. is both necessary and proper in order to determine the rights, obligations, and liabilities that exist among the parties.

## COUNT II
### (TORTIOUS INTERFERENCE WITH CONTRACT)

162.     Plaintiff hereby adopts and incorporates by reference, as if more fully set forth herein, the above-stated paragraphs as incorporated into and part of Count II of this Complaint.

163.     Jurisdiction is proper for this Missouri state law claim pursuant to 28 U.S.C. § 1367. This court has supplemental jurisdiction over the state law claim because the FLSA overtime violations and FMLA violations are so related to the state law claim that they are part of the same common nucleus of operative fact.

164.     Plaintiff entered into a contract or valid business expectancy with Alternative serving as their part-time receptionist.

165.     Defendants had knowledge of the employment relationship between Plaintiff and Defendants.

166.     Defendants intentionally interfered with this contract or valid business expectancy by threatening litigation against Alternative and accusing it of being a "co-conspirator" with Plaintiff. (Exhibit 3).

167.     Due to Defendants' wrongful conduct, Alternative terminated Plaintiff's employment pending the outcome of this litigation.

168.     Defendants lacked any reasonable or legitimate justification for their interference with Plaintiff's business relationship or expectancy.  The non-compete agreement, as explained above, is clearly unenforceable. Moreover, Plaintiff was not competing with Defendants by working for Alternative as a part-time receptionist.  Even if Plaintiff took a position equivalent to

a funeral director in St. Charles County, Defendants would not have legitimate protectable business interests that would be covered by the non-compete agreement.

169.     As a result of Defendants' wrongful conduct, Plaintiff was damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff Plaintiff prays that this Court: (1) award Plaintiff compensatory damages supported by the evidence at trial, plus interest thereto; (2) award punitive damages; (3) award Plaintiff her interest and costs incurred in this action; and (4) award any other such further relief that this Court deems just and proper under the circumstances.

**COUNT III**
**(FAMILY AND MEDICAL LEAVE**
**ACT VIOLATIONS)**

170.     Plaintiff hereby adopts and incorporates by reference, as if more fully set forth herein, the above-stated paragraphs as incorporated into and part of Count III of this Complaint.

171.     The Family and Medical Leave Act, 29 U.S.C. § 2617 ("FMLA"), authorizes court actions by private parties to recover damages for violation of the provisions contained within the FMLA.  Jurisdiction over the FMLA claim of Plaintiff is based upon 29 U.S.C. § 2617 and 28 U.S.C. § 1331.

172.     Plaintiff was an eligible employee of Defendants because she was employed at least 12 months by the Defendants and for at least 1,250 hours of service during the previous 12-month period.

173.     Upon information and belief, both Baue and Memorial Gardens employ 50 or more employees within 75 miles of the St. Charles worksites.  Defendants also meet the integrated employer test because Defendants employ common management, have interrelated operations

between the funeral home and cemetery, have a centralized control of labor relationships, and there is a high degree of common ownership/financial control with both.

174. Plaintiff took FMLA-covered leave from her employment with Defendants when she went to Washington State to care for her great aunt in September 2014.

175. Plaintiff's great aunt stood in loco parentis to Plaintiff when she a child. Plaintiff lived with her great aunt periodically throughout her childhood and fulltime from age 17 and on. In addition, Plaintiff's great aunt cared for Plaintiff as if she was a daughter by providing emotional and financial support.

176. Defendants were aware that Plaintiff's great aunt stood in loco parentis for Plaintiff.

177. Plaintiff's need for FMLA leave was unforeseen, in that she received an unexpected call in September 2014 that her great aunt was suffering from breast cancer. Plaintiff informed Defendants of her need to take leave as soon as possible after becoming aware of the need for leave.

178. Plaintiff told Todd Dilbert, her supervisor, she was immediately leaving for Washington to see and care for her great aunt. Dilbert expressed approval of Plaintiff's leave and did not communicate the need for any paperwork or other information to certify the leave.

179. Under the FMLA, Plaintiff was entitled to take up to 12 weeks of uninterrupted leave to care for her great aunt.

180. Defendants violated Plaintiff's statutory rights under the FMLA by terminating her employment five days after her FMLA-protected leave commenced. Defendants did not communicate the need for any certification of the leave and deprived Plaintiff of any reasonable opportunity to provide certification, to the extent it was required.

181. The decision to terminate Plaintiff was causally related to her taking protected FMLA leave.

WHEREFORE, Plaintiff Plaintiff prays that this court (1) award Plaintiff any wages, salary, employment benefits, and other compensation denied and lost to Plaintiff by reason of the FMLA violation; (2) award Plaintiff liquidated damages in an amount according to proof at trial; (3) award Plaintiff reasonable attorney's fees; (4) award Plaintiff costs of the action; (5) award Plaintiff the interest on the amount lost wages, salary, employment benefits, and other compensation denied or lost to Plaintiff by reason of the violation; and (6) award any and all other such relief that this Court deems just and proper under the circumstances.

**COUNT IV**
**(FLSA VIOLATIONS)**

182. Plaintiff incorporates by reference the above-stated paragraphs as if set forth fully herein.

183. Plaintiff brings this case as an "opt-in" collective action under 29 U.S.C. § 216(b) on behalf of all those who file a consent to join form with the court.

184. Plaintiff individually and on behalf of similarly situated persons who were employed by Defendants within the last three (3) years as Funeral Directors, seeks relief on a collective basis challenging Defendants' practice of failing to pay Plaintiff overtime compensation for all compensable hours worked.

185. The collective group of similarly situated individuals is defined as follows:

> All current and former employees of Defendants who work as Funeral Directors in the State of Missouri who were denied overtime compensation for all compensable hours worked at a rate of one-and-one-half times their regular rate of pay over the past three (3) years, plus periods of equitable tolling, and liquidated damages.

186.     This is an appropriate collective or representative action under 29 U.S.C. § 216(b), commonly referred to as an opt-in collective action. Plaintiff and the putative class are similarly situated in that they are all subject to Defendants' common plan or practice of unlawfully failing to pay its Funeral Directors overtime compensation for all compensable hours worked based upon the overtime provisions of the FLSA as outlined in 29 U.S.C. § 207(a)(1).

187.     The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), authorizes court actions by private parties to recover damages for violation of wage and hour provisions contained within the FLSA.  Jurisdiction over the FLSA claims of Plaintiff is based upon 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

188.     Defendants employed the funeral directors, and were responsible for setting pay and overtime rates, including overtime pay during the period of time in question.

189.     At all times material to this action, Baue and Memorial Gardens is and/or has been the "employer" of Plaintiff and those similarly situated within the meaning of 29 U.S.C. § 203(d). At all times material to this action, Baue and Memorial Gardens are and/or were the "employer" of funeral directors within the meaning of 29 U.S.C. § 203(d).

190.     At all times material to this action, funeral directors are and/or have been "employees" of Defendants as defined by § 203(e)(1) of the FLSA, and worked for Baue and Memorial Gardens within the territory of the United States within three (3) years preceding the filing of this lawsuit.

191.     At all times material to this action, Baue and Memorial Gardens have been enterprises engaged in commerce or in the production of goods for commerce as defined by § 203(s)(1) of the FLSA, with annual revenue in excess of $500,000.

192.    At all times material to this action, Baue and Memorial Gardens have been subject to the pay requirements of the FLSA because they are enterprises engaged in interstate commerce.

193.    Defendants' Funeral Directors are non-exempt hourly employees within the meaning of the FLSA.

194.    Plaintiff brings this action on behalf of herself and those similarly situated and seeks to certify this matter as a FLSA collective action of "Funeral Directors" who were not compensated for overtime hours worked for work functions, including uncompensated phone calls with customers, book reading, and volunteering.

195.    Plaintiff and other Funeral Directors were routinely expected and required to answer phone calls from customers on a company-provided cell phone after working hours. Plaintiff and others similar situated was not paid for answering customer calls outside of scheduled work hours, but risked disciplinary action if they did not answer calls and achieve 100% customer satisfaction as a result.

196.    Defendants also required Funeral Directors to participate in a weekly book club meeting every Wednesday at 7:00 a.m. during paid work time. In preparation for these meetings, Plaintiff and other Funeral Directors were required to spend significant time reading books on business management during their off-the-clock time.

197.    Defendants also required funeral directors to volunteer time during non-work hours. Plaintiff performed mandatory voluntary work for the Share Companion program, where she went to hospitals and helped people who had lost children under the age of thirty (30) days old. Plaintiff and other Funeral Directors were not compensated for the mandatory volunteer work.

198.    The FLSA requires employers to pay non-exempt employees one and one-half times the regular rate of pay at which they are employed for all hours worked over forty (40) hours per work week.  29 U.S.C. § 207.

199.    Defendants' Funeral Directors are entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 216(b).

200.    Defendants' actions, policies, and/or practices violated the FLSA's overtime requirements by failing to compensate Plaintiff for time spent on work activities as described in this Complaint.

201.    Section 207(a)(1) of the FLSA, 29 U.S.C. § 207(a)(1), requires employers to pay non-exempt employees who work longer than forty (40) hours in a workweek one and one-half (1 ½) times the employee's regular rate of pay for the hours worked in excess of forty (40) hours.

202.    Defendants knew or should have known that Funeral Directors were non-exempt employees and knowingly and willfully violated the FLSA by failing to pay Plaintiff overtime compensation for all hours worked.

203.    As a result of the aforesaid willful violations of the FLSA's overtime pay provisions, overtime compensation has been unlawfully withheld from funeral directors by Defendants.  Accordingly, Defendants are liable under 29 U.S.C. § 216(b) for unpaid overtime, as well as liquidated damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs of this action.

WHEREFORE, Plaintiff respectfully prays (1) that the Court direct that notice of this action be provided to all others similarly situated to Plaintiff on the FLSA claim; (2) that the Court certify a class of similarly situated employees for whom a collective action under the FLSA will proceed to trial; (3) that Plaintiff and others similarly situated recover unpaid overtime wages,

liquidated damages, attorney fees, and other relief by reason of Defendants' violations of the FLSA; (4) for this court to enjoin Defendants' unlawful pay practices (5) for a trial by jury on all issues so triable; and (6) for such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury on all claims triable by jury herein.

Respectfully submitted,

By: _____/s/ Kevin J. Dolley_____

Kevin J. Dolley, USDC #54132MO
Laura Spencer Garth, USDC #61645MO
LAW OFFICES OF KEVIN J. DOLLEY, LLC
34 N. Brentwood Blvd., Suite 207
St. Louis, MO 63105
(314)645-4100 (office)
(314)647-4300 (fax)
kevin@dolleylaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT                 )
EASTERN DISTRICT OF MISSOURI                 )
                                             ) ss.
EASTERN DIVISION                             )

**COMES NOW** Sarah Boland, who, being duly sworn upon her oath, states that the information contained in her Verified Complaint for Injunctive Relief, Damages, and Declaratory Judgment is true and correct to the best of her knowledge and information.


*Sarah Boland*
Sarah Boland


Subscribed and sworn to before me, a Notary Public, on this 12th day of March, 2015.


*Jason K. Lewis*
Notary Public


My Commission Expires: September 26, 2017

JASON K. LEWIS
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis City
My Commission Expires: September 26, 2017
Commission Number 13881281